1  ERIC MECKLEY (Bar No. 168181)
   THERESA MAK (Bar No. 211435)
2  MORGAN, LEWIS & BOCKIUS LLP
   One Market Street
3  San Francisco, CA  94105
   Tel: 415.442.1000 / Fax: 415.442.1001
4  emeckley@morganlewis.com
   tmak@morganlewis.com
5
   CLIFFORD D. SETHNESS (Bar No. 212975)
6  JASON M. STEELE (Bar No. 223189)
   MORGAN, LEWIS & BOCKIUS LLP
7  300 South Grand Avenue
   Twenty-Second Floor
8  Los Angeles, CA 90071-3132
   Tel: 213.612.2500 / Fax: 213.612.2501
9  csethness@morganlewis.com
   jsteele@morganlewis.com
10
   *Attorneys for Plaintiff*
11 PACIFIC MARITIME ASSOCIATION

12 ELEANOR MORTON (Bar No. 220407)
   PHIL A. THOMAS (Bar No. 248517)
13 LEONARD CARDER LLP
   1188 Franklin Street, Suite 201
14 San Francisco, CA 94109
   Tel: 415.771.6400 / Fax: 415.771.7010
15 emorton@leonardcarder.com
   pthomas@leonardcarder.com
16
17 *Attorneys for Defendant*
   ILWU LOCAL 10
18

19            UNITED STATES DISTRICT COURT

20            NORTHERN DISTRICT OF CALIFORNIA

21 PACIFIC MARITIME ASSOCIATION, a      Case No. CV 11-1659 PJH
   California corporation,
22                                      STIPULATION AND ~~PROPOSED~~ ORDER
                     Plaintiff,         GRANTING LEAVE TO FILE FIRST
23                                      AMENDED COMPLAINT
             vs.
24
   INTERNATIONAL LONGSHORE AND
25 WAREHOUSE UNION, LOCAL 10, an
   unincorporated labor organization,
26
                     Defendant.
27

28

MORGAN, LEWIS &
  BOCKIUS LLP
ATTORNEYS AT LAW
 SAN FRANCISCO

DB2/22477683 1

                                        STIPULATION RE FAC
                                        CV 11-1659 PJH

## STIPULATION

Plaintiff Pacific Maritime Association ("PMA") and Defendant International Longshore and Warehouse Union, Local 10 ("Defendant"), through their counsel of record, hereby STIPULATE that PMA may file the First Amended Complaint attached hereto as Exhibit A.

Dated: ~~June 7, 2011~~ July 22, 2011

LEONARD CARDER LLP

By: _____
Eleanor Morton
Attorneys for Defendant
INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION, LOCAL 10

Dated: June 8, 2011

MORGAN LEWIS & BOCKIUS LLP

By: _____
Eric Meckley
Attorneys for Plaintiff
PACIFIC MARITIME ASSOCIATION

## ORDER

Based on the foregoing STIPULATION of the parties, and good cause appearing, the Court hereby GRANTS leave to Plaintiff Pacific Maritime Association to file a First Amended Complaint. The proposed First Amended Complaint attached as Exhibit A to the Stipulation is deemed FILED as of the date of this Order.

Dated: 7/25/11 _____

Hon. Phyllis J. Hamilton
U.S. District Judge

IT IS SO ORDERED
Judge Phyllis J. Hamilton

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

STIPULATION RE FAC
CV 11-1659 PJH

1   ERIC MECKLEY (Bar No. 168181)
    THERESA MAK (Bar No. 211435)
2   MORGAN, LEWIS & BOCKIUS LLP
    One Market Street
3   San Francisco, CA  94105
    Tel: 415.442.1000 / Fax: 415.442.1001
4   emeckley@morganlewis.com
    tmak@morganlewis.com
5
    CLIFFORD D. SETHNESS (Bar No. 212975)
6   JASON M. STEELE (Bar No. 223189)
    MORGAN, LEWIS & BOCKIUS LLP
7   300 South Grand Avenue
    Twenty-Second Floor
8   Los Angeles, CA  90071-3132
    Tel: 213.612.2500 / Fax: 213.612.2501
9   csethness@morganlewis.com
    jsteele@morganlewis.com
10
    *Attorneys for Plaintiff*
11  PACIFIC MARITIME ASSOCIATION

12  ELEANOR MORTON (Bar No. 220407)
    PHIL A. THOMAS (Bar No. 248517)
13  LEONARD CARDER LLP
    1188 Franklin Street, Suite 201
14  San Francisco, CA 94109
    Tel: 415.771.6400 / Fax: 415.771.7010
15  emorton@leonardcarder.com
    pthomas@leonardcarder.com
16
17  *Attorneys for Defendants*
    ILWU LOCAL 10
18
19                  UNITED STATES DISTRICT COURT
20               NORTHERN DISTRICT OF CALIFORNIA

21  PACIFIC MARITIME ASSOCIATION, a        Case No. CV 11-1659 PJH
    California corporation,
22                                          **FIRST AMENDED COMPLAINT FOR**
                        Plaintiff,          **CONFIRMATION AND ENFORCEMENT**
23                                          **OF LABOR ARBITRATION AWARDS**
                    vs.
24
    INTERNATIONAL LONGSHORE AND
25  WAREHOUSE UNION, LOCAL 10, an
    unincorporated labor organization,
26
                        Defendant.
27

28
MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/66984549.4

1    Plaintiff PACIFIC MARITIME ASSOCIATION, for its Complaint against Defendant

2  herein, alleges as follows:

### JURISDICTION

3

4    1.    This is an action to confirm and enforce a final and binding arbitration award

5  issued pursuant to a collectively-bargained grievance and arbitration process.  This action arises

6  under Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. §

7  185.  Jurisdiction is conferred upon this Court by the provisions of that section.

8    2.    Plaintiff PACIFIC MARITIME ASSOCIATION ("PMA") is, and at all times

9  mentioned herein was, a non-profit corporation organized and existing under and by virtue of the

10  laws of the State of California.  PMA maintains its principal office at 555 Market Street, San

11  Francisco, California.

12    3.    PMA is a multi-employer collective bargaining association whose members

13  include stevedoring companies, terminal operators, and maintenance and repair contractors

14  ("Member Employers") that employ dockworkers, including longshoremen, throughout the

15  United States Pacific Coast.  PMA represents these employers in collective bargaining

16  negotiations with the labor organizations that represent these employees and in the administration

17  of the resulting labor agreements.  PMA and its Member Employers are, and at all times

18  mentioned herein were, employers in an industry affecting commerce, as defined in Section 501

19  of the Labor Management Relations Act of 1947, 29 U.S.C. § 142, and Section 2 of the National

20  Labor Relations Act, 29 U.S.C. § 152, and within the meaning of Section 301 of the Labor

21  Management Relations Act, 29 U.S.C. § 185.

22    4.    The International Longshore and Warehouse Union ("ILWU International") is a

23  labor union.  It is composed of a number of local unions, including those in its Longshore

24  Division. ILWU International, by and through its respective officers, designated members, and

25  agents, is the sole and exclusive collective bargaining agent for the longshoremen employed by

26  Member Employers at U.S. West Coast ports, including at ports in the San Francisco Bay Area,

27  and ILWU International has held itself out as possessing, and does possess, the requisite legal

28  authority to become and remain a party to a binding contract with PMA for and on behalf of its

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2                    FIRST AMENDED COMPLAINT
                     CV 11-1659 PJH

1    Longshore Division Locals and the longshoremen.

2        5.       Defendant INTERNATIONAL LONGSHORE AND WAREHOUSE UNION,

3    LOCAL 10 ("Local 10") is the ILWU Longshore Division Local for ports in the San Francisco

4    Bay Area. Local 10 is an unincorporated labor union and maintains its principal offices in San

5    Francisco, California. Local 10 is, and at all times mentioned herein was, a labor organization

6    representing employees in an industry affecting commerce, as defined in Section 501 of the Labor

7    Management Relations Act, 29 U.S.C. § 142, Section 2 of the National Labor Relations Act, 29

8    U.S.C. § 152, Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

9                                **FACTUAL BACKGROUND**

10       6.       The ILWU, on behalf of itself, the Longshore Division Locals, including Local 10,

11   and the longshoremen they represent, is a party to a collective bargaining agreement with PMA

12   known as the PACIFIC COAST LONGSHORE CONTRACT DOCUMENT 2008-2014,

13   effective as of July 1, 2008 ("PCLCD"). The PCLCD governs the terms and conditions of work

14   for longshoremen employed by PMA's Member Employers. The PCLCD is, and at all times

15   mentioned herein was, in full force and effect.

16       7.       Section 8.5 of the PCLCD, entitled "Furnishing of gangs and supporting men,"

17   provides in part as follows:

18           8.51 Each dispatching hall shall furnish on any day required up to at
             least the agreed to number of gangs and supporting men, as well as
19           up to any number agreed to, or arrived at through Contract
             procedures, in the future.
20
21       8.       Section 11 of the PCLCD, entitled "NO STRIKES, LOCKOUTS AND WORK

22   STOPPAGES," provides in part as follows:

23           "11.1 There shall be no strike, lockout or work stoppage for the life of this
             Agreement."
24
             "11.2 The Union or the Employers, as the case may be, shall be required to secure
25   observance of this Agreement."

26           "11.3 How work shall be carried on."

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                          3                    FIRST AMENDED COMPLAINT
                                                               CV 11-1659 PJH

"11.31 In the event grievances or disputes arise on the job, all men and gangs shall continue to work as directed by the employer in accordance with the specific provisions of the Agreement or if the matter is not covered by the Agreement, work shall be continued as directed by the employer."

"11.46 Application of Contract Grievance Machinery."

"11.461 The grievance machinery, pending investigation and adjudication of on the job disputes, requires that work shall be performed in accordance with specific provisions of the Agreement, or if the matter is not covered by the Agreement, work shall be continued as directed by the employer."

Exceptions to Section 11.46 (not relevant here) arise only where workers in good faith believe that to continue to work pending resolution of the dispute (1) immediately endangers health and safety or (2) imposes an onerous workload.

9.      Section 17 of the PCLCD, entitled "JOINT LABOR RELATIONS COMMITTEES, ADMINISTRATION OF AGREEMENT AND GRIEVANCE PROCEDURES," provides a mandatory procedure for the presentation, adjustment and settlement of grievances, with binding arbitration as the final step. That procedure includes expedited steps for disputes regarding strikes, lockouts, or work stoppages and requirements to follow arbitration awards even when appealing them.

10.     Under Section 17 of the PCLCD, disputes that cannot be resolved by the Joint Port Labor Relations Committee ("JPLRC") may be submitted to an Area Arbitrator for resolution. Either side may appeal an Area Arbitrator's decision to the Coast Labor Relations Committee ("CLRC"). The CLRC's decision may be appealed to the Coast Arbitrator.

11.     Section 17.16 of the PCLCD provides, "Pending investigation and adjudication of such disputes work shall continue and be performed as provided in Section 11."

12.     Section 17.261 of the PCLCD provides in part, "Any decision . . . of an Area Arbitrator claimed by either party to conflict with this Agreement shall immediately be referred at the request of such party to the Joint Coast Labor Relations Committee (and, if the Joint Coast Labor Relations Committee cannot agree to the Coast Arbitrator, for review).

13.     Section 17.282 of the PCLCD provides, "If the local grievance machinery becomes stalled or fails to work, the matter in dispute can be referred at once by either the Union

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

FIRST AMENDED COMPLAINT
CV 11-1659 PJH

1    or the Association to the Joint Coast Labor Relations Committee for disposition."

2        14.    Section 17.55 of the PCLCD provides in part, "All decisions of the arbitrators,

3    except as provided in Sections 17.261 and 17.6, shall be final and binding upon all parties."

4        15.    Section 17.57 of the PCLCD provides, "All decisions of arbitrators shall be

5    observed and/or implemented. No decision of an Area Arbitrator, interim or formal, can be

6    appealed unless it is observed and/or implemented."

7        16.    Section 17.6 of the PCLCD, entitled "Informal hearings and interim rulings"

8    provides a procedure for the presentation, adjustment and settlement of grievances or disputes to

9    an Area Arbitrator when work is not being continued as required by Section 11 of the PCLCD.

10       17.    Section 18 of the PCLCD, entitled "GOOD FAITH GUARANTEE," provides as

11   follows:

12          "18.1  As an explicit condition hereof, the parties are committed to
            observe this Agreement in good faith. The Union commits the
13          locals and every longshoreman it represents to observe this
            commitment without resort to gimmicks or subterfuge. The
14          Employers give the same guarantee of good faith observance on
            their part."

15

16       18.    Local 10 and its officers and the longshoremen they represent are under a duty to

17   abide by the above-mentioned provisions of the PCLCD.

18                                   **COUNT ONE**

19       19.    On information and belief, at some point prior to or early on the morning of April

20   4, 2011, Local 10 informed San Francisco Bay Area longshoremen about the Wisconsin March

21   for Solidarity Rally occurring on the same day. As a result, longshoremen represented by Local

22   10 failed to appear for work in violation of the PCLCD.

23       20.    At approximately 7:00 a.m. on April 4, 2011, upon observing that no

24   longshoremen were in the dispatch hall for morning dispatch, PMA contacted Local 10 and

25   contended that the longshoremen's actions constituted a failure to dispatch in violation of Section

26   8.51 of the PCLCD, a work stoppage in violation of Section 11 of the PCLCD, and a failure to

27   observe the PCLCD in good faith in violation of Section 18 of the PCLCD. Local 10 disagreed.

28   PMA then immediately moved the dispute to the relief Area Arbitrator, Joe Lucas. (Terry Lane,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                        5                    FIRST AMENDED COMPLAINT
                                                             CV 11-1659 PJH

the designated Area Arbitrator for Northern California, was unavailable from April 3, 2011 through April 9, 2011.) Relief Arbitrator Lucas denied the allegation of a work stoppage in violation of Section 11 of the PCLCD but found Local 10 was in violation of Sections 8.51 and 18 of the PCLCD by its failure to dispatch longshoremen. PMA separately appealed the denial of the Section 11 violation through the PCLCD's grievance and arbitration process.

21.     Despite the ruling from the Relief Arbitrator, no longshoremen were in the dispatch hall for the start of night dispatch at approximately 3:30 p.m. on April 4, 2011. Thus, Local 10 had refused to comply with the Relief Arbitrator's ruling from that morning. Because the grievance machinery had failed to work and pursuant to Section 17 of the PCLCD, PMA brought the dispute to the Coast Labor Relations Committee for resolution. PMA moved for confirmation and enforcement of the Relief Arbitrator's ruling and an order to Local 10 to fill the available jobs through dispatch. The parties reached disagreement.

22.     At approximately 6:23 p.m. on April 4, 2011, the Coast Arbitrator, John Kagel, as the final step in the grievance and arbitration procedure under the PCLCD, issued a written award entitled "Order re Local 10 to abide by PCLCD and Section 8.51." Arbitrator Kagel concluded that Local 10 was in violation of Sections 8.51 and 18 of the PCLCD and ordered Local 10 to abide by Section 8.51 and all other provisions of the PCLCD until a formal Area Arbitration decision to the contrary.

23.     The Kagel Award is final and binding under the PCLCD and should be confirmed and enforced by the Court.

## COUNT TWO

24.     PMA appealed the portion of Relief Arbitrator Lucas' April 4, 2011 interim ruling denying a Section 11 violation to the Northern California Area Arbitrator pursuant to Sections 17.63 and 17.631 of the PCLCD. Because the Area Arbitrator, Terry Lane, was on vacation, the CLRC directed that the matter be heard by Oregon Area Arbitrator Jan Holmes. Area Arbitrator Holmes conducted a hearing on April 5, 2011, at which both PMA and Local 10 presented witnesses, evidence, and argument.

25.     On April 9, 2011, Area Arbitrator Holmes issued Award NCAA-023-2011, which

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

FIRST AMENDED COMPLAINT
CV 11-1659 PJH

1    contained the following Decision:

2        1.    ILWU Local 10, its officers and members, are guilty of violation of Sections
              8.51, 11.1, 11.2, and 18 of the PCLCD.

3        2.    ILWU Local 10, its officers and members shall be directed to cease and desist
4              any stop work actions and recognize their commitment to observe the
              Agreement in good faith in accordance with Section 18 and all other provisions
5              of the PCLCD.

6    26.    ILWU International has stated that it does not contest NCAA-023-2011.

7    27.    Award NCAA-023-2011 is final and binding under the PCLCD and should be

8    confirmed and enforced by the Court.

9                                **PRAYER FOR RELIEF**

10       Plaintiff PMA prays for judgment as follows:

11       1. That the Court enter an order confirming and enforcing the Coast Arbitrator's April 4,

12   2011 Award, attached hereto as Exhibit A.

13       2. That the Court enter an order confirming and enforcing the Area Arbitrator's April 9,

14   2011 Award (NCAA-023-2011), attached hereto as Exhibit B.

15   Dated: June 8, 2011              MORGAN, LEWIS & BOCKIUS LLP

16

17                                   By
18                                      Eric Meckley
                                        Attorneys for Plaintiff
19                                      PACIFIC MARITIME ASSOCIATION

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

FIRST AMENDED COMPLAINT
CV 11-1659 PJH

# EXHIBIT A

IN ARBITRATION PROCEEDINGS PURSUANT TO HE
PACIFIC COAST LONGSHORE CONTRACT DOCUMENT BETWEEN THE
PARTIES

| | |
|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, ]<br><br>Union, ]<br>and ]<br><br>PACIFIC MARITIME ASSOCIATION, ]<br><br>Employers. ]<br><br>Re: Order re Local 10 to abide by     PCLCD ]<br>and Section 8.51 ] | ORDER<br>of<br>JOHN KAGEL<br>Coast Arbitrator<br><br>April 4, 2011<br>Palo Alto, California |

ORDER:

On representation of the Employers, the Relief Area Arbitrator has found Local 10 in violation of Sections 8.51 and 18 of the PCLCD, and Union LRC members are not available, being on flights. Local 10 is required to abide by Sections 8.51 and all other provisions of the PCLCD until a formal Area Arbitrator decision to the contrary.

The decision is sent as an email attachment and is to be considered as if signed by the Coast Arbitrator.

SO ORDERED.

_____
Coast Arbitrator

1

# EXHIBIT B

| | |
|---|---|
| IN THE MATTER OF A CONTROVERSY ) | NCAA-023-2011 |
| ) | |
| ) | |
| BETWEEN ) | OPINION AND DECISION |
| ) | |
| INTERNATIONAL LONGSHORE AND ) | OF |
| WAREHOUSE UNION, LOCAL 10 ) | |
| ) | JAN R. HOLMES |
| AND ) | OREGON AREA ARBITRATOR |
| ) | Substitute for Northern California Area |
| ) | Arbitrator |
| ) | |
| PACIFIC MARITIME ASSOCIATION ) | OAKLAND, CALIFORNIA |
| ) | |
| ISSUE:  – Formal Appeal of Interim Award ) | April 9, 2011 |
| NCAA-018-2011 - April 4, 2011. ) | |

A formal hearing was held at 2:00 PM at the Pacific Maritime Association, 475 14th Street, Suite 300, Oakland, California on April 5, 2011. The parties were afforded a full opportunity to present witnesses, evidence, and arguments. A certified court reporter was present to provide a transcript.

FOR THE UNION:          Richard Mead, ILWU Local 10
                        Frank Gaskin, ILWU Local 10
                        Melvin Macky, ILWU Local 10

FOR THE EMPLOYERS:      David Robinson, Pacific Maritime Association
                        William Bartelson, Pacific Maritime Association
                        Art Chu, Pacific Maritime Association
                        Dan Kaney, Pacific Maritime Association
                        Kristen Vinje, Pacific Maritime Association
                        Rickey Childs, Eagle Marine Services
                        Gus Fashanu, Eagle Marine Services
                        Darryl Lobo, Ports America
                        Kevin Mehlberg, SSAT
                        Norman Kaiser, Ports America
                        Mike Walker, Ports America
                        Dennis Woodfork, Ports America

## BACKGROUND

The Northern California Area Relief Arbitrator made an interim decision at approximately 8:15 AM on April 4, 2011, and an oral ruling was issued (NCAA-018-2011). The written decision has not yet been issued. The Employers were dissatisfied with the interim ruling and requested a formal appeal under Sections 17.63 and 17.631, PCLCD. As the Northern California Area Arbitrator was on vacation, the Coast Labor

Relations Committee, in a letter dated April 4, 2011, directed the Oregon Area Arbitrator to serve as a substitute Area Arbitrator for the Section 17.631, PCLCD, formal appeal of Interim Award NCAA-018-2011 to be heard on Tuesday, April 5, 2011, at 2:00 PM. The hearing was held as directed by the CLRC. In accordance with Section 17.63, PCLCD, the Area Arbitrator is required to proceed as if there had been a failure to agree on the question by the Joint Port Labor Relations Committee. The Employers requested that the Arbitrator render a bench decision. The Union held that such a decision was not necessary. The Arbitrator denied the Employers' request for a bench decision in order to have the opportunity to thoroughly consider the positions of the parties after a review of the transcript. A formal decision shall be rendered within twenty-four (24) hours after receipt of the transcript of the hearing in accordance with Section 17.631, PCLCD (10:23 AM, April 8, 2011).

## APPLICABLE CONTRACT SECTIONS

### Section 8.51
Each dispatching hall shall furnish on any day required up to at least the agreed to number of gangs and supporting men, as well as up to any number agreed to, or arrived at through Contract procedures, in the future.

### Section 11.1
There shall be no strike, lockout or work stoppage for the life of this Agreement.

### Section 11.2
The Union or the Employers, as the case may be, shall be required to secure observance of this Agreement.

### Section 17.63
If either party is dissatisfied with the interim ruling, the question shall be immediately referred at the request of such party to the arbitrator for hearing and decision in accordance with the normal procedure under Section 17.5 of this Agreement; the arbitrator shall then proceed as if there had been a failure to agree on the question by the Joint Port Labor Relations Committee, provided that the arbitrator may temporarily delay a hearing to permit prompt bona fide efforts to settle the question in the Port or Area Joint Labor Relations Committee.

### Section 17.631
Formal area arbitration hearings on disputes regarding violations of Subsection 11.1, conducted in accordance with Section 17.63, shall be heard within twenty-four (24) hours following the issuance of the interim ruling to both parties by the Area Arbitrator. The formal decision shall be rendered within twenty-four (24) hours after receipt of the transcript of the hearing.

### Section 18.1
As an explicit condition hereof, the parties are committed to observe this Agreement in good faith. The Union commits the locals and every longshoreman it represents to

Arbitration Award NCAA-023-2011                                                3
April 9, 2011

observe this commitment without resort to gimmicks or subterfuge. The Employers give
the same guarantee of good faith observance on their part.

EMPLOYERS' POSITION

Approximately one hundred eleven (111) jobs were to be dispatched out of the hall on
the first shift, April 4, 2011.  Ten (10) flex jobs were dispatched at 6:00 AM, however,
over forty (40) jobs were replaced that morning by steadies and individuals who had
accepted flex jobs earlier.  These jobs were left unfilled.  The Employers met in an LRC
at approximately 7:00 AM, April 4, with the Union business agent when it was evident
that the Union failed to meet its obligation to provide manpower.  The Employers stated
that the Union was in violation of Sections 8.51 and 11.1 of the Agreement.  The Union
representative stated that he had no idea why the hall was empty but would investigate.
At approximately 7:15 AM, when no announcements were made, no members were
present in the dispatch hall, and the dispatchers were not receiving or making phone
calls in an effort to dispatch the hanging jobs, the Employers informed the Union they
were calling the Relief Arbitrator as work was not continuing per Section 17.61, PCLCD.
At approximately 8:15 AM, the Relief Arbitrator spoke to both the Employers and the
Union via phone and issued his ruling.  The Employers hold that the Relief Arbitrator
was proper in finding the Union guilty of violation of Sections 8.51 and 18, PCLCD,
however erred in his decision by not finding the Union guilty of violation of Sections 11.1
and 11.2, PCLCD.  Accordingly, the Employers have appealed the decision, NCAA-018-
2011, to a formal hearing in accordance with Section 17.631, PCLCD.

It is clear, supported by testimony and evidence that ILWU Local 10, its members and
officers, specifically President Richard Mead, are guilty of violation of Sections 8.51,
11.1, 11.2, and 18 of the Agreement for a work stoppage by failing to fill jobs properly
ordered by the Employers for the first shift on Monday, April 4, 2011.  The Union
planned and executed a concerted and deliberate action to void the dispatch hall of
members on April 4, 2011, for members to attend a rally in support of workers in
Wisconsin.  Failure to provide manpower caused an illegal work stoppage in violation of
Section 11.1, PCLCD.

Concerted action to cause a work stoppage on April 4, 2011, is evident by the March 8,
2011, Memorandum from ILWU International President McEllrath addressed to all ILWU
Locals calling for April 4, 2011, to be a day to stand in solidarity (Employers Exhibit #3),
the "Resolution in Support of April 4 No Business as Usual Solidarity Actions," by the
San Francisco Labor Council submitted by Marcus Holder of ILWU Local 10 which
called for "industrial action . . . to support such action by engaging, wherever possible,
in work stoppages, sick-outs and any other solidarity actions" (Employers Exhibit #4),
messages on the dispatch hall tape by the ILWU Local 10 president (Employers
Exhibits #6 and #8), the email forwarded by an ILWU Local 10 member (Union delegate
to the Alameda Labor Council) to other Local 10 members, and a current news
broadcast played at the hearing whereby a Local 10 Executive Board member was
quoted as saying "It was us volunteering to withhold our labor" (Transcript Pages 97-
98), etc.  Numerous news articles also support the Employers position (Employers

Arbitration Award NCAA-023-2011                                             4
April 9, 2011

Exhibits #9A-9F). Further, at the Nation Day of Action rally held across the street from
the PMA building a local 10 member was observed whispering in the ear of an Alameda
Labor Council representative which resulted in her announcing to the crowd the she had
just received word that ILWU Local 10 had shut down the port of Oakland.

The Union is required to secure observance of the Agreement, in accordance with
Section 11.2, PCLCD. Further, as held by Coast Arbitrator Sam Kagel in Coast Award
C-2-1965, Union officials are held to a higher standard of conduct and they have the
affirmative duty to enforce the Agreements as written. The Union is responsible for its
men. ILWU Local 10 was the only local on the Coast that stopped work and the only
one of any other union affiliated locals to stop work. The Union has the power to
enforce its policies upon its members. The International president of the ILWU called
for support from the members to participate in a solidarity rally to support the Union
workers in Wisconsin. Other locals managed to continue to work and support their
cause without a work stoppage. The President of Local 10, Mr. Mead, and his other
officers planned and executed this illegal work stoppage and except for a few members,
the rest of Local 10 followed his lead.

Employer Exhibit #13 confirms that this is a serious issue. This was not a case of a few
jobs hanging in the hall; there was no labor provided on two shifts back-to-back on April
4, 2011. Clearly, based on the evidence of the failure to fill manpower on the first shift,
April 4, 2011, on this level the Employers made the following motions:

1. Local 10, its Members and Officers, specifically President Richard Mead,
   are guilty of violating Sections 8.51, 11.1, 11.2 and 18 of the Agreement.
2. That the Arbitrator vacate any portion of Relief Arbitrator Lucas's award
   from the first shift on Monday, April 4, 2011, that speaks to Local 10 not
   being in violation of Section 11.
3. That Local 10, its Officers and Members shall immediately be directed to
   cease and desist their concerted stop work actions and recognize their
   commitment to observe the Agreement in good faith in accordance with
   Section 18, and all other provisions of the PCLCD.
4. That Local Officers will advise their members on the joint dispatch tape as
   well as making announcements during tonight's dispatch to all its
   members of the outcome of today's arbitration and to cease and desist
   these illegal work stoppages and abide by all the provisions of the
   PCLCD.

UNION'S POSITION

The Union objected to the Arbitrator conducting this hearing, as the parties had not
received the written decision of the Relief Arbitrator. The Union held that the Employers
have attempted to proceed in the past with issues when there has not been a written
interim ruling. There is no reason that the parties had to arbitrate this issue today. In
the past, such as in NCAA-007-2004, the Employers pursued an appeal twenty (20)
days after the initial interim arbitration hearing. Further, the Employers have not

pursued an arbitration in other cases when the Union failed to fill orders. Additionally, in the past when manpower failed to fill, such as in NCAA-014-2011, dated March 26, 2011, the area arbitrator found the Union guilty of Section 8.51, PCLCD, not Section 11. Though the Union acknowledged the Employers have the right to appeal the grievance in question within twenty-four (24) hours under Section 17.631, PCLCD, that doesn't mean that it is right or appropriate. Such expedited arbitration procedure does not allow the Union the time necessary to sufficiently prepare. In this case, the Union simply could not fill its jobs because insufficient men came to the hall on the morning of April 4, 2011, which was their individual right.

There is much more to this case than the claim of a work stoppage, such as, issues involving shifting of men and court injunctions, etc. Further, charges of improprieties have been made against a PMA representative in his duties as a dispatch hall observer to the Pacific Maritime Association area manager that is before the Joint Port Labor Relations Committee. In addition, the Union has requested registration for additional Class B longshoremen and the Employers have only recently agreed to register twenty-five (25), not the one hundred (100) requested by the Union. Clearly there is a need for additional registration in the port.

The ILWU Local 10 Executive Board member statements cited and the articles submitted by the Employers as examples of the Union's concerted action do not speak for the Union and they are not credible. Some individuals cited speak for the Alameda Labor Council, some may be quotes from individual longshoremen, but they do not represent ILWU Local 10 or its position.

The Employers are also targeting a Union official in their motions. The Employers' record of the statement made by the Union President was "pretty accurate". It stated, "Participation in the National Day of Action in support of the workers in Wisconsin is voluntary. If you want to go to work, go to work. If you choose not to go to work, the Union asks that you exercise your right to assemble and free speech by going to a rally (Transcript Page 78). People have First Amendment rights. They have a right to assemble. They have a right to free speech. The only requirements under the Agreement are availability requirements that vary whether you are a Class A, Class B, or casual longshoreman. There is nothing that was said on the dispatch tape by the Union President that was a violation of the Agreement. He did not call for a work stoppage.

Further, the rally was not an ILWU Local 10 event. The Alameda Labor Council put on the rally that was attended by PMA staff and the one in San Francisco was put on by the San Francisco Labor Council (Employers Exhibit #9F). Mr. Mead did not hear anybody say that they shut down the port at either of the rallies. No longshoreman stood up at either rally and said that they shut down the port.

The email submitted by the Employers (Employer Exhibit #7) was sent to more people than appeared on the actual exhibit, including the Northern California Area Arbitrator. Accordingly, this exhibit was not an accurate representative of what was sent. The

email originated from the Alameda Labor Council, not from ILWU Local 10, and was forwarded to ILWU Local 10 members by Local 10's delegate to the Alameda Labor Council, Mr. Mackay.

In Northern California Arbitration Award NCAA-014-2011 (Union Exhibit #2) the Employers also accused the ILWU Local 10 officials and members of an illegal work stoppage and the Arbitrator ruled that it was a violation of Section 8.5, not Section 11.1, PCLCD, just as the Relief Arbitrator did in this case. Further, in Employers Exhibit # 11, the formal appeal was not made until twenty (20) days after the initial interim decision.

The Union held that there is no reason to be before the Arbitrator now. No written interim decision has been received. This morning, April 5, 2011, the Union was not able to fill their jobs and the Employers are not pursuing the issue to arbitration. Though the Union hasn't appealed NCAA-011-2011, yet this shows the problems that are also behind this issue. It is essential that the parties come to the table in good faith and sit down and talk. The Employers should not use the contract as a weapon.

ILWU Local 10 is not guilty of violation of Sections 8.51, 11.1, 11.2, and 18, PCLCD. ILWU Local 10 did not organize the National Day of Action rally and did not say anything in violation of the Agreement. ILWU Local 10 members had the right to attend this rally if they so chose. This was a case of not enough members showing up at the hall to fill the jobs. The Union asks that the Arbitrator deny the Employers' motions.

DISCUSSION

Though a written interim decision had not been received prior to this hearing and decision, it is clear that the parties understood that the Employers had moved that the Union, its members and officers were guilty of violation of Sections 11.1, 11.2, 8.51, and 18, PCLCD, and that the Relief Area Arbitrator ruled that the Union was guilty of Section 8.51, PCLCD, however, not guilty of Section 11 and subsections. The Union protested that the hearing was held prior to receiving a written Interim decision. The Employers submitted a partial transcript of a hearing in which they allege the Northern California Arbitrator ruled that it was not necessary for the parties to have a written decision to proceed under the terms of the Agreement. The Union requested that the entire transcript of that hearing be submitted into the record. Upon review, this Arbitrator determined that transcript of the previous case was not necessary as this arbitration was being held under the direction of the Coast Labor Relations Committee per the letter to the Oregon Area Arbitrator dated April 4, 2011, Section 17.63, which mandates that in an appeal of an interim decision, the arbitrator shall "proceed as if there had been a failure to agree on the question by the Joint Port Labor Relations Committee," and Section 17.631, PCLCD. Further, to accept the Union's interpretation and wait for a written decision would render Section 17.631, PCLCD, unenforceable, as in many cases a written decision is not received until days after the hearing. Formal appeals of interim decisions prior to 2008, when Section 17.631, PCLCD, was added to the Agreement, may have been heard well after the interim decision was rendered and such fact has no bearing on this case.

Questions of what evidence and testimony were to be considered in this arbitration were addressed by the Arbitrator. The Union requested that the Relief Area Arbitrator be called on the phone to get his testimony. First, in reference to the question of not having the written decision, the Arbitrator concluded that the parties agreed to the specific provisions the Relief Arbitrator had ruled upon in his decision and due to the fact that in the formal appeal the Arbitrator is bound to hear the dispute as if the disagreement between the parties had never been heard, testimony was not needed from the Relief Area Arbitrator explaining his decision. Secondly, in reference to allegations by the Union, refuted by the PMA, that the PMA Area Manager acted improperly toward the Relief Area Arbitrator after he made his initial ruling are serious allegations and should not be discounted. However, as this case was a formal appeal of NCAA-018-2011, which occurred at 8:15 AM on April 4, 2011, testimony and allegations as to what happened after the initial ruling, by either the Union or the Employers, should be considered separate from this formal appeal. Accordingly, this Arbitrator is restricting the arguments of both parties to the facts of the dispute that occurred prior to 8:15 AM, April 4, 2011, at which time the Relief Area Arbitrator made his decision resulting in interim award NCAA-0018-2011, April 4, 2011. Arguments and discussions of subsequent events, other than to substantiate the initial set of facts, will not be considered in this decision, including, but not limited to, most of the testimony of PMA representative, Ms. Vinje, the facts and events leading up to and surrounding the two (2) subsequent arbitration decisions made by the Relief Arbitrator on April 4, 2011, etc.

The facts in this case are, properly placed manpower orders were placed in the hall for approximately one hundred eleven (111) jobs and over forty (40) replacements were requested and none were filled for the first shift of April 4, 2011. Those requesting replacements did not wait for their replacements, as is the practice in this area. The statistics of whether there were any jobs dispatched other than the ten (10), 6:00 AM flex jobs, of which some called replacements after accepting dispatch, was not clear to the Arbitrator. However, essentially, longshoremen did not go to the dispatch hall, no jobs were filled, and the dispatchers did not make any attempt to fill any of the jobs. The SSAT representative testified that their terminal had to shut down for the day and others had to consolidate the manpower they did have on the job to keep the yard and gate operations working to process the long line of trucks. Work could not continue as required by Section 11. A rally was held across the street from the PMA offices on April 4, 2011, officially organized by the Alameda Labor Council. These facts were not disputed. Accordingly, it was proper that the Union was found in violation of Section 8.51, PCLCD, for failing to supply manpower.

The question remains whether the Union was guilty of violation of Sections 11.1 and 11.2, PCLCD, by their concerted action creating a work stoppage. The Union argued more was going on between the parties than a simple work stoppage, that the longshoremen have the right to choose not to work, and that they only have the requirement to be available based on their registration status, i.e., Class A, Class B, etc. Under similar circumstances, the Northern California Area Arbitrator ruled that the Union

was guilty of violation of Section 8.51, PCLCD, not Section 11.1, PCLCD, in NCAA-014-2001. Further, the Union, its officers and members, as evident by the transcript of the tape by the Union President, said such participation in the National Day of Action rally was "voluntary." Mr. Mead stated in the hearing that he did not hear any Local 10 member say or stand up and say that they had shut down the port during the Oakland rally. That the Employers' supporting documents do not prove that anyone in the capacity of representing ILWU Local 10 admitted to causing the port to shut down or require that the longshoremen not work and come to the rally.

The Arbitrator finds that Northern California Award NCAA-014-2011, (Union Exhibit #2) was a different set of circumstances than today. In the case today, the dispatch hall was empty, jobs did not fill and various terminals were shut down. This is not denied. The longshoremen did not come to the hall and take the available jobs and there was no attempt by the dispatchers to fill the jobs. The Union's allegations against the PMA representative in his capacity as a dispatch hall observer does not explain or justify failing to meet its obligations under the terms of the Agreement. Though the Employers reported that various Union officials claimed that they did not know what was going on as to why no one was reporting for work, it is evident that the Union was fully aware of the call by the ILWU International President, the Union President, and Local 10 members in various capacities to participate in the rally. All other ILWU locals provided manpower as ordered on April 4, 2011, including the clerks and walking bosses in this area.

The Area Arbitrator found the testimony of PMA representative, Mr. Robinson, of the circumstances leading to the Relief Arbitrator's decision and to the numbers of members in the hall to be credible. His testimony describing what happened in the hall on the morning of April 4 was not refuted (Transcript Pages 30-34). The Union did, however, imply through questioning and in its rebuttal that the reason Mr. Willis, a Local 10 member and former officer, started yelling (to clear the hall) was because he saw Mr. Robinson, who the Union had charged with improprieties in his capacity as a dispatch hall observer. Even accepting the Union's explanation that the reason for Mr. Willis' actions were because Mr. Robinson was in the hall and there were claims filed against him by the Union to not be in the dispatch hall as an observer, that would not justify telling the longshoremen present to clear the hall. The Union called into question the testimony of PMA Area Manager, and without opening up a debate of what transpired after the interim decision was rendered, the Arbitrator determined that his testimony was not necessary in order to render a decision in this case.

Section 11.2, PCLCD, requires that the Union secure observance of the Agreement. The Agreement also provides that there shall be no work stoppages. What happened on the first shift, April 4, 2011, was an en masse, collective action by ILWU Local 10, its officers and members, resulting in a shutdown of the port. It is evident that there was concerted action on the part of the local members and its officers. First and foremost, that conclusion is reached by looking at the evidence of a total port shut down. The conclusion is also supported by the communication from the ILWU International office, the call to participate by the ILWU Local 10 President (though stated it was voluntary),

Arbitration Award NCAA-023-2011                                      9
April 9, 2011

the advance planning, the email notification of the event, the actions of Local 10 members in the dispatch hall, and the failure of longshoreman to appear at the hall for work.   Further, verbal statements of members in various capacities, such as Mr. Thomas' statement on the television broadcast, confirmed by Mr. Meade who was standing next to him at the time he was interviewed support this conclusion.

The Area Arbitrator did not find the Employers' argument to specifically cite Mr. Mead to have merit, as sufficient support to single him out was not provided.   Accordingly, the Area Arbitrator made the following decision.

<u>DECISION</u>

1. ILWU Local 10, its officers and members, are guilty of violation of Sections 8.51, 11.1, 11.2, and 18 of the PCLCD.

2. ILWU Local 10, its officers and members shall be directed to cease and desist any stop work actions and recognize their commitment to observe the Agreement in good faith in accordance with Section 18 and all other provisions of the PCLCD.


/s/   Jan R. Holmes
Jan R. Holmes
Oregon Area Arbitrator
Substitute for Northern California Area    Arbitrator